**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Arthur Randall SANDERS, Jr., Gulf Coast News Agency, Inc., Trans World America, Inc., a/k/a TWA, Inc., and William Walter, Defendants-Appellants.**

No. 77–5715.

United States Court of Appeals,
Fifth Circuit.

April 2, 1979.

Rehearing and Rehearing En Banc
Denied June 15, 1979.

Glenn Zell, Atlanta, Ga., for Sanders, Gulf, TWA.

W. Michael Mayock, Los Angeles, Cal., for Walter.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Donald B. Nicholson, Philip Wilens, Chief, Dept. of Justice, Govt. Regulations & Labor Sec., Crim. Div., Washington, D. C., for plaintiff-appellee.

Before WISDOM, AINSWORTH and CLARK, Circuit Judges.

AINSWORTH, Circuit Judge:

Arthur Sanders, William Walter, Gulf Coast News Agency, Inc. ("Gulf Coast News") and Trans World America, Inc. ("TWA") appeal their convictions under 18

U.S.C. § 371 for conspiring knowingly to use a common carrier to ship obscene materials interstate, in violation of 18 U.S.C. § 1462, and knowingly to transport obscene matter interstate for the purpose of sale or distribution, in violation of 18 U.S.C. § 1465. Sanders, Walter and Gulf Coast News also challenge their convictions for substantive violations of sections 1462 and 1465.[1] Appellants all allege an unconstitutional search and seizure and attack the district court's jury instructions on obscenity; appellant Walter further contends that he "was not shown to possess the requisite scienter." We find these assertions to be without merit and therefore affirm the convictions.

## I. Facts

According to the testimony at trial, on September 15, 1975, Richard Larson, the manager of appellant Gulf Coast News, located in St. Petersburg, Florida, ordered an employee to deliver 12 cartons, containing a series of 8 mm. films entitled "David's Boys,"[2] to Greyhound Bus Package Express in St. Petersburg for shipment to Atlanta.

The packages had a nonexistent return address and named a fictitious corporation, "D and L Distributors," as shipper. Described as containing printed matter, they were sent on a "will call" basis to "Leggs, Inc.," another fictitious company. "Legs" was the nickname of a female employee at appellant TWA's Atlanta headquarters. When the cartons reached Atlanta, Greyhound forwarded them to a branch station located near L'Eggs Products, Inc. ("L'Eggs"), a manufacturer of women's hosiery and regular customer of Greyhound Package Express. After Greyhound informed L'Eggs of the shipment, Michael Horton, a L'Eggs Products employee, came to the terminal, opened one of the cartons and discovered that it contained sexually explicit movies. Horton returned to the L'Eggs office and described the package's contents to a superior, William Fox. Concerned that his company might be implicated in the transportation of pornographic films, Fox drove to the Greyhound station and brought the 12 cartons to the L'Eggs office. He and several other employees opened all the packages and found individu-

1. Under 18 U.S.C. § 371,
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 18 U.S.C. § 1462 provides in pertinent part that
 Whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—
 (a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or . . .
 Whoever knowingly takes from such express company or other common carrier any matter or thing the carriage of which is herein made unlawful—
 Shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.
 18 U.S.C. § 1465 provides that

 Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 The transportation as aforesaid of two or more copies of any publication or two or more of any article of the character described above, or a combined total of five such publications and articles, shall create a presumption that such publications or articles are intended for sale or distribution, but such presumption shall be rebuttable.
 When any person is convicted of a violation of this Act, the court in its judgment of conviction may, in addition to the penalty prescribed, order the confiscation and disposal of such items described herein which were found in the possession or under the immediate control of such person at the time of his arrest.

2. The series "David's Boys" included 25 individual movie titles. The 12 cartons contained 871 reels of film.

al boxes of film. The top of each film box showed the name "David's Boys" and a drawing of two nude males embracing and kissing; on the back of each were the title of the individual movie and a detailed description, in explicit terms, of the bizarre homosexual acts depicted in the film. Fox then telephoned the FBI, explained the nature of the films and asked "them to come out and take the materials away." The FBI procured the films on October 1, 1975, and subsequently viewed them on a projector at its offices. No warrant was obtained.

Appellants Walter and Sanders, who jointly operated appellants TWA and Gulf Coast News, were indicted along with both corporations under 18 U.S.C. § 371 on one count of conspiring knowingly to use a common carrier to ship obscene materials interstate, in violation of 18 U.S.C. § 1462, and knowingly to transport obscene matter interstate for the purpose of sale and distribution, in violation of 18 U.S.C. § 1465. Gulf Coast News, Walter and Sanders were also charged with five counts of substantive violations of section 1462 and five substantive violations of section 1465.[3] The jury convicted TWA of conspiracy and returned guilty verdicts as to Walter, Sanders and Gulf Coast News on all eleven counts. The district court fined TWA $10,000, Gulf Coast News $33,000 and sentenced both Walter and Sanders to three years in prison on each count, to run concurrently.

## II. The Constitutionality of the Search and Seizure

 Appellants first urge that the district court committed reversible error in failing to suppress the five films admitted in evidence at trial. Since appellants TWA and Gulf made no pretrial motion to suppress, they cannot raise this issue on appeal. *United States v. Bush,* 5 Cir., 1978, 582 F.2d 1016, 1018. Though appellants Sanders and Walter each made a timely motion to suppress and return the films, the district court

sought to determine at the outset whether they had standing to challenge the constitutionality of the search and seizure. To establish such standing under traditional Fourth Amendment analysis, a defendant must either show presence on the searched premises at the time of search, allege a proprietary or possessory interest in the premises or objects searched or be charged with an offense that includes as an essential element possession of the seized evidence at the time of the contested search and seizure. *See Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973); *United States v. Hunt,* 5 Cir., 1974, 505 F.2d 931, 939–40. "Generally, a defendant satisfies the standing requirement if he has an adequate possessory interest in the place or object searched to give rise to a reasonable expectation of privacy." *United States v. Hunt, supra,* 505 F.2d at 938.

In denying appellants' suppression motion, the district judge held that "shipping or causing or suffering to be shipped by a common carrier . . . with a fictitious name given for the shipper as well as the fictitious name given for the consignee or addressee, amounts to a relinquishment or abandonment of any reasonable expectation of privacy. Or, stated another way, it seems to me that it was reasonably foreseeable that what actually occurred would occur. That is to say, that there was substantial likelihood that the material would be misdelivered and fall into the hands of some third party, as actually happened in this case, where it would be opened and its privacy, if it had any, invaded." There is merit in the district court's conclusion. However, the Supreme Court has recently "dispens[ed] with the rubric of standing . . . by frankly recognizing that this aspect of the analysis belongs more properly under the heading of substantive Fourth Amendment doctrine," *Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978) so we will focus "on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any

---

**3.** The five counts under section 1462 and the five section 1465 counts enumerated the same five movies from the "David's Boys" series:

"Look at the Birdie," "The Clean Up," "Black Rape," "The Massage," and "Loving Hands."

theoretically separate, but invariably intertwined concept of standing." *Id.,* —— U.S. at ——, 99 S.Ct. at 428.

### A. The Search by L'Eggs Products Employees

 Appellants Sanders and Walter argue that the L'Eggs Products employees, in opening the 12 cartons and examining their contents without a warrant, conducted an unconstitutional search. The Fourth Amendment's warrant requirement, of course, is intended solely "as a restraint upon the activities of sovereign authority," *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921), and "a search . . . conducted by a private individual for purely private reasons, . . does not fall within the protective ambit of the Fourth Amendment." *United States v. Lamar,* 5 Cir., 1977, 545 F.2d 488, 489–90; *United States v. Jones,* 5 Cir., 1972, 457 F.2d 697, 699; *Barnes v. United States,* 5 Cir., 1967, 373 F.2d 517, 518. However, if under the circumstances of the case the private party "acted as an 'instrument' or 'agent' of the government," the ostensibly "private" search must meet the amendment's standards. *United States v. Bomengo,* 5 Cir., 1978, 580 F.2d 173, 175. *See Lustig v. United States,* 338 U.S. 74, 79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949). Before the L'Eggs Products employees ever contacted the FBI, they had on their own initiative taken the shipment of films from the bus terminal, opened the cartons, examined the individual film boxes and ascertained the nature of the films. Since "there is no indication in the record" that in so doing the L'Eggs employees "acted at the behest or suggestion, with the aid, advice or encouragement, or under the direction or influence of the F.B.I.," we conclude that these activities constituted a private search, beyond the scope of the Fourth Amendment. *United States v. Clegg,* 5 Cir., 1975, 509 F.2d 605, 609.

### B. FBI Acceptance of the Films

Nevertheless, Sanders and Walter contend that the FBI unconstitutionally seized the films, by accepting them from the L'Eggs employees without obtaining a warrant. In making this assertion, they rely principally on the Eighth Circuit's decision in *United States v. Kelly,* 1976, 529 F.2d 1365. There, an employee of a common carrier discovered that a ripped-open carton of goods contained sexually explicit books and magazines and called the FBI, which sent an agent who examined several of the magazines and retained samples, without obtaining a warrant. Although the *Kelly* court said that the common carrier's search was private, it held that the Government's subsequent acceptance of the fruits constituted a seizure requiring a warrant, "unless there are special circumstances which excuse compliance with the . . . warrant requirement," decided that no exception to that requirement applied and concluded that the warrantless "seizure" was "so unreasonable as to necessitate the operation of the exclusionary rule." *Id.* at 1371.

The result in *Kelly* conflicts with the reasoning implicit in a long line of private search decisions by the Supreme Court and this circuit. In every such case, introducing the fruits of a private search as evidence was impossible unless the private party had at some point surrendered the articles to the Government. Yet neither we nor the Supreme Court have ever held that government acceptance of those articles constitutes a seizure requiring compliance with the warrant requirement, even in cases where no exception to that requirement would have covered the Government's action. *See, e. g., Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Lamar,* 5 Cir., 1977, 545 F.2d 488; *United States v. Blanton,* 5 Cir., 1973, 479 F.2d 327; *Barnes v. United States,* 5 Cir., 1967, 373 F.2d 517. Thus, we decline to accept the *Kelly* court's analysis.

 In *United States v. Sherwin,* 9 Cir., 1976, 539 F.2d 1, the Ninth Circuit, sitting en banc, also rejected the *Kelly* rationale. *Sherwin* also involved a common carrier employee who examined the contents of damaged packages, discovered sexually explicit books and called the FBI, which sent

agents who removed two books from the shipment, without a warrant. Citing *Kelly,* the *Sherwin* defendants argued on appeal that "a seizure to which the fourth amendment is applicable occurred . . . when the F.B.I. agents obtained the two books" from the common carrier, *id.* at 7, but the Ninth Circuit did "not regard the government's acceptance of materials obtained in a private search to be a seizure" and concluded that "the fourth amendment [is] not implicated when articles discovered in a private search [are] voluntarily turned over to the government." *Id.* We agree with the Ninth Circuit's reasoning. Under the circumstances, we hold that the FBI's acceptance of the "David's Boys" films from the L'Eggs employees was not a seizure within the meaning of the Fourth Amendment.

## C. Viewing of the Films

■ Appellants Sanders and Walter further assert, basing their argument on another Eighth Circuit case, *United States v. Haes,* 1977, 551 F.2d 767, that the Government conducted an additional unconstitutional search by viewing the films on a movie projector without obtaining a warrant. In *Haes,* the employee of a common carrier, seeking to identify the consignee of a shipment, opened a package, discovered sexually explicit films and contacted the FBI, which sent two agents with a movie projector to the common carrier's office, where the films were screened without first obtaining a warrant. Declaring that "the inquiry must be whether the government" thereby undertook "any new or different searches," the Eighth Circuit said that the Government's viewing of the films "changed the nature of the search," because the private search had involved no such screening, and held that the search was illegal, since no exception to the warrant requirement applied. *Id.* at 773–74.

Unlike *Haes,* however, where the private party "had not viewed the films and had not attempted to make a decision as to whether or not they were obscene," *id.* at 771, the L'Eggs employees were able to make "a determination of possible obscenity prior to turning the films over to the FBI," [4] *id.* at 772, by examining the individual boxes containing the films. In this case, the legend "David's Boys" and a cartoon of two nude males kissing and embracing appeared on one side of each film box; the other side carried the title of the individual film and a detailed description, in language of the utmost explicitness, of the bizarre homosexual acts depicted in the movie.[5] Under these circumstances, since

---

4. In announcing its holding on this issue, the *Haes* majority emphasized the factual circumstances and noted that "[w]e would feel otherwise if the private search had included any sort of viewing of the films and a determination of possible obscenity prior to turning the films over to the F.B.I." 551 F.2d at 771–72. Under the factual circumstances here, however, the L'Eggs employees did not need actually to screen the films to make that determination. The Eighth Circuit stressed that *Haes* "was not the case" where "the private employee had tangible evidence upon which to believe that the material was being illegally transported in interstate commerce," *id.* at 772 n.1, but here, in contrast, the individual film boxes amply supported the belief of the L'Eggs employees that such illegal transportation had occurred.

5. The indictment listed five of the 25 "David's Boys" titles included in the shipment. The individual boxes containing "Look at the Birdie" said that

Corbett really gets turned on when Rich comes over for a photo session. In the a-- close-ups you won't believe! The highlight

of the movie happens when Corbett masturbates and ---- on Rich's face! This is a flick you will not forget.

"The Clean Up (3 white)" boxes read that

Lenny and Eric turn each other on and when you see these good looking studs you'll know why!!! The action gets heavy and then Les enters the picture.—galore and Les cleans it up like you've never seen. Great close-ups!

The "Black Rape" (1 blk. 1 wht.) boxes stated that

Big Black Lance has an 11″ ---- but it doesn't take long before the small slender Larry is taking it all right up the ___! Good tongue action and a surprise that you won't believe. You will love the close-up action.

The boxes containing "The Massage" explained that

Angelo the masseur gets turned on as he gives Tommy a rubdown. Angelo's expert tongue & hands soon have Tommy's ___ hard & excited. But he wants it the Greek way and Angie complies. Then he ____ beautiful on Tommy's face! This is one of the best close-ups of french love you will ever see!!

the L'Eggs employees so fully ascertained the nature of the films before contacting the authorities, we find that the FBI's subsequent viewing of the movies on a projector did not "change the nature of the search" and was not an additional search subject to the warrant requirement.[6] We have held that the reopening and reinspection of a bag by government authorities following a private search does not constitute a separate, independent search requiring a warrant. *United States v. McDaniel,* 5 Cir., 1978, 574 F.2d 1224, 1226–27; *United States v. Blanton,* 5 Cir., 1973, 479 F.2d 327, 328. These decisions support our conclusion on this issue, for in our view, "much less than reopening and reinspection of the box and its contents was the activity of the FBI" here.[7] *United States v. Pryba,* 1974, 163 U.S.App.D.C. 389, 399, 502 F.2d 391, 401.[8] *See also United States v. Ford,* 10 Cir., 1975, 525 F.2d 1308, 1312.[9]

> Finally, the "Loving Hands" boxes said that
>
> Murray and Carl are well into their love session when Ben enters the room. He will show you his loving hands as he shoves them with his arms __ (just short of his elbows!) right up his friends' a__ h____!! While they masturbate! It is a true masterpiece for the avid connoisseur!!

(Certain particularly salacious words have been deleted by the writer of this opinion, as indicated.)

6. We note as well the question posed by then Judge Webster in his *Haes* dissent:

> Can it be seriously argued that an agent receiving a suspected book or magazine from a freight carrier employee could not reasonably open the publication and peruse its pages to determine whether its contents offended the law? Would a government agent who used a magnifying glass or other mechanical aid to identify an object be vulnerable to a claim of an unreasonable search independent of the lawful private search which produced the object? I think clearly not.
> The film in this case was not a means of concealing something else. In looking at the film through a projector, the agents did no more than view the motion pictures in the manner in which they were intended to be viewed. 551 F.2d at 772–73.

7. The Supreme Court's decision in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) does not affect the outcome of this case. In *Chadwick,* the federal agents gained exclusive custody of property still to be searched, whereas here, the FBI took control of property that had already been searched by a private party and did not conduct any additional search of its own requiring a warrant. *See also United States v. Johnson,* 5 Cir., 1979, 588 F.2d 147.

8. In *Pryba,* a nervous shipper, reluctant to disclose the contents of a box, aroused the suspicions of an air freight clerk in San Francisco. The clerk's supervisor opened the box and found "unpackaged reels of 8–millimeter color movie film bearing titles unsubtly suggesting sex." The supervisor held two films up to the light and saw both hetero- and homosexual nude couples "engaging in sexual acts." He called the FBI, which sent an agent with a movie projector to the freight carrier's office. After watching two more movies, with the FBI agent still present, the supervisor repackaged the films and replaced the boxes in transit to Washington. 163 U.S.App.D.C. at 393, 502 F.2d at 395. Judge Spottswood Robinson first concluded that the activities of the clerk and his employer before the FBI brought the movie projector constituted a private search and then declared that "we are unable to perceive in the subsequent events any new or different search after the F.B.I. agent arrived. There is respectable authority holding that not even a reopening and reinspection of a package by federal officers, after the initial opening and inspection by airline personnel entirely on their own, constitutes a separate or additional search subject to Fourth Amendment requirements. We need not venture nearly so far, for much less than reopening and reinspection of the box and its contents was the activity of the FBI in the instant case." *Id.* 163 U.S.App.D.C. at 399, at 401.

9. In *Ford,* as in *Pryba,* a nervous shipper, at first unwilling to identify the contents of a package, led an air freight supervisor to unwrap the box. He discovered "about eight prophylactics, six or seven inches long, containing a powdered substance," and called the local police. When the officers arrived, they conducted an "on-the-spot field test" which "showed that the substance was heroin." 525 F.2d 1308. Rejecting the assertion that the agents thereby conducted an illegal, warrantless search, the Tenth Circuit said that the "government agents appeared only after the suspicion of the possible presence of contraband was confirmed by discovery of the prophylactics. At this point, it was the province and indeed the duty of the officers to further investigate the open box, which they did without any invasion of protected rights of privacy, to determine whether the suspicious substance in plain view was in fact contraband . . . . .

### III. Walter's Scienter

■ Appellant Walter contends that there was insufficient evidence to sustain his conviction, because the Government failed to establish a "close nexus" between him and "a specific shipment of proved obscene matter" and because there was no evidence as to scienter. This assertion is meritless, as there was ample evidence to support the jury's finding that Walter knowingly used a common carrier to ship obscene materials interstate, knowingly transported obscene matter interstate for the purpose of sale or distribution and knew the obscene nature of the films shipped interstate.

According to the testimony at trial, Walter and Sanders jointly operated an extensive network of adult cinemas, bookstores and distribution warehouses, which included appellants TWA and Gulf Coast News. Ernest Golden, who had served as accountant and bookkeeper for these various enterprises, testified that he received instructions from both Walter and Sanders when keeping accounts and preparing tax returns for a number of corporations, including TWA and Gulf Coast News. William Boshell, who succeeded Golden as accountant, testified that Walter and Sanders both supplied him with the business records of the various corporations. He said that Walter, Sanders and all the corporations had their offices at TWA and added that he was paid with a TWA check for services rendered to the other businesses.

John Catoe, an employee of Walter and Sanders, related at trial that both men told him in 1973 that they were planning a new corporation to distribute sexually explicit materials and that Sanders later stated that this corporation was TWA. According to Catoe, he and all other TWA employees received work instructions from both Walter and Sanders. Catoe also said that when the two men sent him to Florida to manage a new bookstore in June 1975, they explained that Gulf Coast News had been

established to supply their Florida operations. In addition, Catoe stated that Walter gave him expense money and ordered him to follow the directions of Richard Larson, the manager of Gulf Coast News, whom Catoe had met at TWA when Larson was being trained. Ronald Bowman, the Gulf Coast News employee who delivered the "David's Boys" films to Greyhound's St. Petersburg terminal, testified that on one visit to the Gulf Coast News warehouse Sanders was introduced as the man "[y]ou will be working for" and that on another occasion Walter was introduced as Sanders' partner. Bowman also recalled that Richard Larson described the two as partners and identified as theirs the desks in the back of the warehouse. Finally, Carol Maxey, Sanders' former girl friend, testified that Sanders told her that he and Walter jointly owned a number of businesses, including Gulf Coast News.

Given the foregoing testimony describing Walter's central role in the management of TWA, Gulf Coast News and other companies involved in the distribution and sale of hardcore pornography, we do not believe that "the jury must necessarily have had a reasonable doubt" that he possessed the requisite scienter, *United States v. Warner,* 5 Cir., 1971, 441 F.2d 821, 825, *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). Accordingly, we conclude that there was sufficient evidence to support Walter's conviction.

### III. The District Court's Instructions on Contemporary Community Standards

■ Finally, appellants challenge the district court's jury instructions regarding the community standards element of the definition of obscenity. They contend that *Pinkus v. United States,* 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978) and our subsequent decision in *United States v. Bush, supra,* required the trial judge expressly to charge the jury not to consider children in determining the contemporary standards of

government agents arrived." *Id.* at 1312. Similarly, the FBI agents here, in viewing the films on a projector, were attempting to confirm or

dispel the suspicion, first developed by the L'Eggs employees, that the films had been transported illegally.

"the average person of the community as a whole." We reject appellants' expansive reading of *Pinkus* and *Bush* and find no error in the district court's instructions.

In *Pinkus,* the trial judge had charged the jury that, in ascertaining community standards, " 'you are to consider the community as a whole, young and old, educated and uneducated, the religious and the irreligious, men, women and *children,* from all walks of life'." *Pinkus v. United States, supra,* 436 U.S. at 296, 98 S.Ct. at 1811 (emphasis added). The Supreme Court elected "to take this occasion to make clear that children are not to be included for these purposes as part of the 'community' as that term relates" to the definition of obscenity and therefore held that "it was error to instruct the jury that . . . [children] were a part of the relevant community." *Id.* at 1812. Similarly, in *Bush* the district court had told the jury that "you are to consider the community as a whole, *young and old,* educated and uneducated, religious and the irreligious." (emphasis added) In holding that this charge constituted reversible error, we reasoned that inclusion of "[t]he phrase 'young and old' . . . provides a jury ample freedom to consider children, and thus does not completely avoid the danger, emphasized in *Pinkus,* that 'the adult population [will be reduced] to reading only what is fit for children.' " (citation omitted) 582 F.2d at 1021–22.

Here, however, unlike the instructions in *Pinkus* and *Bush,* the trial judge's charge did not prescribe jury consideration of "children" or "young people" in determining community standards. The district court told the jurors to judge the obscenity of the films by whether their "predominant appeal . . . viewed in [their] entirety, is to

the prurient interest of *the average person of the community as a whole,* or the prurient interest of a deviant sexual group, as the case might be, and is so patently offensive that it is utterly without redeeming social value." (emphasis added) The judge further explained that "[w]hether the predominant theme or purpose of the material is an appeal to the prurient interest of the 'average person of the community as a whole' is a judgment which must be made in light of contemporary standards as would be applied by the average person with an *average and normal attitude toward, and an average interest in, sex.*" (emphasis added) This instruction adequately directed jury consideration to the contemporary standards of adults and thereby avoided the danger emphasized in *Pinkus* and *Bush.*

■ We have carefully examined appellants' remaining assertions [10] and conclude that they are meritless. Accordingly, we affirm the judgments of conviction as to all appellants.

AFFIRMED.

WISDOM, Circuit Judge, dissenting:

I respectfully dissent. Today the Court holds that the government may take possession of 12 cartons containing 871 films, view the films two months later, retain them for yet another two months—without obtaining a warrant at any point—if the films are the fruit of a private search. The majority reaches the conclusion that the FBI's acquisition of the films in this case falls short of a "seizure" without considering the first amendment interest at stake when expressive matter is taken out of circulation by the government. "The Fourth Amendment . . . must not be read in a vacuum". *Roaden v. Kentucky,* 1973, 413 U.S. 496, 501, 93 S.Ct. 2796, 37 L.Ed.2d 757. In my

---

10. Appellants also contend, individually or in unison, that by accepting and holding the whole shipment of films the Government engaged in prior restraint in violation of the first amendment, that the trial judge should have granted a change in venue, that he erred in refusing to admit comparison evidence and that the district court should have compelled the prosecution to present expert witnesses. In addition, they assert numerous errors in the

trial judge's other rulings on pretrial and trial motions and in his instructions to the jury and argue that the voir dire conducted by the court was insufficient. Finally, Walter urges that the prosecution was guilty of prejudicial misconduct, that juror misconduct also prejudiced appellants, that the district court erred in denying his motion for severance and that the films were not obscene.

view, the approach of the Eighth Circuit Court of Appeals in *United States v. Kelly*, 1976, 529 F.2d 1365, represents the proper accommodation of the first and fourth amendments. I would reverse the defendants' convictions on the ground that the films were seized in violation of the fourth amendment and, therefore, were illegally admitted into evidence.

## I.

The majority presents the facts accurately but not completely. A longer look at the events that occurred once the employees of L'Eggs Products, Inc. notified the FBI of the receipt of the shipment of films leads me to the conclusion that the defendants retained a constitutionally protectible interest in the films that was impermissibly intruded upon by the government.

On September 26, 1977, Michael Horton, area manager for L'Eggs, pried upon one of twelve packages, which were so unusually securely wrapped and reinforced that they did not look "normal" to him. He discovered that the carton contained film boxes with various sexual scenarios described on the covers. Horton passed on this information to his branch manager, William Fox. Fox then went to the Greyhound terminus, informed the Greyhound employee in charge that the boxes did not belong to L'Eggs, but took them with him anyway, without, however, paying the collect charges. Later, Fox informed FBI agent Mandyk of the incident. Mandyk told Fox to put the cartons aside until he arrived. He also asked the L'Eggs employees to obtain the name of anyone who called to inquire about the packages.

Meanwhile, the defendants made several attempts to find their shipment. One of the defendants called Greyhound to report that the packages were missing. He put a tracer on the shipment, leaving his name and telephone number with Greyhound. During the next few days several of the defendants visited the Greyhound station. Although the assistant terminal manager knew that the packages had been taken to the L'Eggs office, on the instructions of the FBI he did not provide the defendants with this information. Instead, he told the FBI about the inquirers. The defendants also called the L'Eggs office. They, too, denied that they had the shipment.

Five days after Fox called the FBI, two agents arrived at the L'Eggs office and took possession of the packages and their entire contents. Two months later Agent Mandyk screened each of the 871 films on an office projector. There were twenty-five title films; the remaining 846 films were copies. Another two months elapsed before the FBI turned the films over to the United States Attorney's office. Over a year later the indictments were returned. Of the twenty-five title films, the government charged that five were obscene.

## II.

The major teaching of the Supreme Court's decisions in the obscenity area is that some form of judicial procedure "designed to focus searchingly on the question of obscenity" must precede governmental interference with material arguably within the protection of the first amendment. *See Heller v. New York*, 1973, 413 U.S. 483, 489, 93 S.Ct. 2789, 37 L.Ed.2d 745; *A Quantity of Books v. Kansas*, 1964, 378 U.S. 205, 210, 84 S.Ct. 1723, 12 L.Ed.2d 809; *Marcus v. Search Warrant of Property*, 1961, 367 U.S. 717, 732, 81 S.Ct. 1708, 6 L.Ed.2d 1127. Because the FBI did not apply to a magistrate for a warrant at any point, the only judicial determination of obscenity was made at the trial on October 21, 1977—over two years after the 871 films were taken out of circulation by the government. Yet the majority relegates to a footnote the defendants' contention that there was an illegal prior restraint. *See* note 10 of the majority opinion.

I must assume from the majority's dismissal, without discussion, of the issue of prior restraint that it agrees with the government that there is no first amendment interest at stake in this case. Before this Court, the government argued that the films were not entitled to the protection of the first amendment because they were fur-

tively distributed. When taken, the films were neither being sold nor exhibited to the general public; hence, the government reasons, the public's first amendment right of access to nonobscene matter was not infringed. To support its contention that films enjoy no special constitutional status unless they are available to the general public, the government relies on language in a decision of the Second Circuit Court of Appeals. "This was strictly an underground operation in hard core pornography with clandestine storage facilities not intended to be available to the public . . . The 'setting' then is hardly such as to presumptively invoke first amendment protection." *United States v. Cangiano*, 2 Cir. 1974, 491 F.2d 906, 913, cert. denied, 419 U.S. 904, 95 S.Ct. 188, 42 L.Ed.2d 149.

It is, of course, true that the procedural safeguards required by the first amendment vary with "the nature of the materials seized and the setting in which they are taken". *Roaden v. Kentucky*, 1973, 413 U.S. 496, 503, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757. A prior adversary hearing must be held before a large quantity of expressive material is seized by the government for the purpose of destruction. *See A Quantity of Books v. Kansas*, 1964, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809; *Marcus v. Search Warrant of Property*, 1961, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127; *Lee Art Theatre v. Virginia*, 1968, 392 U.S. 636, 88 S.Ct. 2103, 2104, 20 L.Ed.2d 1313 (per curiam). "[S]eizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence in a criminal proceeding." *Heller v. New York*, 1973, 413 U.S. 483, 492, 93 S.Ct. 2789, 2794, 37 L.Ed.2d 745. Such a seizure is permissible if a neutral magistrate issuing the warrant determines that there is probable cause to believe that the film is obscene and an adversary hearing is available promptly after the seizure.

When films are not subject to absolute suppression, in the sense of destruction, and the public interest in free circulation of the films is attenuated, less stringent procedural limitations on governmental action may be justified. This does not mean, however, that films furtively distributed to a small cadre of customers lose all constitutional protection and may be treated by the government as if they were contraband or ordinary instruments of a crime. The protection of the first amendment cannot turn solely on the size of the audience that expressive matter will reach. History teaches that the first amendment is concerned not only with the public's right of access but also with the right of unpopular and small minorities to express their views. Nor should first amendment protection hinge on the method of dissemination, for unpopular minority views are most likely to be disseminated in a furtive and clandestine fashion. *See United States v. Alexander*, 8 Cir. 1970, 428 F.2d 1169, 1175; Note, *The Right to an Adversary Hearing on the Issue of Obscenity Prior to the Seizure of Furtively Distributed Films*, 69 Mich.L.Rev. 913, 926–40 (1971).

Indeed, the question before the Second Circuit Court of Appeals in *Cangiano* was not whether the films were presumptively under the protection of the first amendment. The FBI obtained a warrant before seizing the material and an adversary hearing was available upon request by the defendant. The Court merely held that the "setting" was not such as to invoke the requirements of a prior adversary hearing before seizure. I do not know any cases, certainly not in this Circuit, holding that the taking of furtively distributed films raises no first amendment concerns at all. Such a proposition would be startling in light of the Supreme Court's decision in *Heller v. New York*, 1973, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745. There, a single copy of a film was seized. Because other copies were available for screening to the public, there was no restriction on the public's right of access. Yet, the Court held that the copy could be seized as evidence only if the government observed strict pro-

cedural safeguards.[1] "The necessity for a prior judicial determination of probable cause will protect against gross abuses, while the availability of a prompt judicial determination in an adversary proceeding following the seizure assures that difficult marginal cases will be considered in light of First Amendment guarantees". 413 U.S. at 493, 93 S.Ct. at 2795.

I have elaborated on decisions in the area of obscenity and prior restraints to demonstrate that the defendants had a legitimate first amendment interest in the films at the time they were taken by the FBI. I do not decide whether the restraint imposed in this case was so extensive that an adversary hearing should have been held before the films were taken. It is unnecessary to decide that question because the government did not observe the minimum procedural safeguards demanded by the Supreme Court in *Heller*. I point out, however, that unlike *Heller* the amount of material taken by the FBI in this case must be termed "massive". The retention of 846 copies far exceeds the requirements of officers seeking to pursue criminal charges. Moreover, we do not know whether the films were earmarked for storage in a warehouse or whether they were on the threshold of dissemination. One cannot assume, therefore, that the FBI's actions did not block the orderly distribution of the films. And in that circumstance, the Supreme Court has implied that the requirements of *A Quantity of Books* must be met. *Heller v. New York*, 1973, 413 U.S. at 492, 93 S.Ct. 2789.

### III.

Given the special constitutional character of the items taken by the FBI, I see two mutually supporting reasons that compel application of the exclusionary remedy in this case.

In the first place, the first amendment is an independent source of restrictions upon the power of the police to take expressive material. For example, because of first amendment concerns, a film cannot be seized as an incident to a lawful arrest. *Roaden v. Kentucky*, 1973, 413 U.S. 497, 93 S.Ct. 2796. This is true even though the fourth amendment is generally understood to permit the seizure of items during a lawful arrest. *Chimel v. California*, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. As the Court explained in *Roaden*, the seizure of a copy of a film "by a police officer, without the authority of a constitutionally sufficient warrant, is plainly a form of prior restraint". 413 U.S. at 504, 93 S.Ct. at 2801. "The seizure proceeded solely on the police officer's conclusions that the film was obscene; there was no warrant. Nothing prior to seizure afforded a magistrate an opportunity to 'focus searchingly on the question of obscenity.'" 413 U.S. at 506, 93 S.Ct. at 2802. Thus, to supply the necessary judicial determination of obscenity, the Supreme Court harnessed the fourth amendment procedural guarantee of a neutral magistrate.[2]

Functionally, the government's acceptance of the films in this case resembles a

1. The first articulation of the view that furtively distributed films are entitled to no first amendment protection was in a district court opinion, *United States v. Pryba*, D.D.C.1970, 312 F.Supp. 466. There, too, a warrant was obtained before seizure of the films. The decision of the district court was upheld by the District of Columbia Court of Appeals on the alternative theory that the requirements of *Heller* were satisfied. *United States v. Pryba*, 1974, 163 U.S.App.D.C. 389, 412–13, 502 F.2d 391, 404–05.

2. The Supreme Court has also held that the first amendment imposes its own, more stringent limitations on obtaining and executing a search warrant. A judicial warrant for the seizure of a film may not be issued "solely upon the conclusory assertions of the police officer without any inquiry by the justice of the peace into the factual basis for the officer's conclusions." *Lee Art Theatre, Inc. v. Virginia*, 1968, 392 U.S. 636, 637, 88 S.Ct. 2103, 2104, 20 L.Ed.2d 1313 (per curiam); *Marcus v. Search Warrant of Property*, 1961, 367 U.S. 717, 731–32, 81 S.Ct. 1708, 6 L.Ed.2d 1127. Furthermore, where books are seized, a heightened degree of specificity in a search warrant's description of "things to be seized" is required. *Stanford v. Texas*, 1965, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431. "But where the special problems associated with the First Amendment are not involved . . . a more 'reasonable particularity' . . . is permissible". *Berger v. New York*, 1967, 388 U.S. 41, 98, 87 S.Ct. 1873, 1904, 18 L.Ed.2d 1040. (Harlan, J., dissenting).

"seizure" resulting in a prior restraint. It is a nonjudicially imposed suppression of expressive matter. Like a seizure "proceed[ing] solely on the police officer's conclusions", the acceptance and retention of the films wholly frustrated the exercise of first amendment rights without any searching inquiry by a magistrate into the merits of the first amendment claim. It is imperative, therefore, to view the acquisition of these films by the FBI as a "seizure" subject to the procedural guarantees of the fourth amendment.[3]

The suppression of the films as evidence is also justified under traditional fourth amendment doctrine.

I start from the premise that the defendants had a constitutionally protectible privacy interest in the packages before they were discovered by the employees of L'Eggs. The district court held that shipping material by means of a common carrier to a fictitious consignee amounted to a relinquishment or abandonment of any reasonable expectation of privacy. The majority agrees with this conclusion. See page 791 of the majority opinion. The increased likelihood that the parcel would be misdelivered cannot be equated with an abandonment of all reasonable expectations of privacy. Misdelivered packages are usually returned; indeed, they are usually returned unopened. The careful manner in which the films were wrapped in individually sealed containers as well as the use of a fictitious cover name for the addressee demonstrates, instead, a strong desire to maintain the defendants' interest in privacy, to avoid the contents getting into the wrong hands, and to continue ownership of the films or a possessory interest in the

films until their delivery into the right hands.

The initial search of these films was by private parties and was, therefore, outside the scope of the fourth amendment. *Burdeau v. McDowell*, 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048. A search, however, is merely the first step in an invasion of privacy that ends with the introduction in court of incriminating evidence. When the initial search is conducted by private parties, the question remains whether governmental conduct after that point amounts to an independent invasion of the right of privacy controlled by the standards of the fourth amendment. *See generally* Note, *Private Searches and Seizures*, 90 Harv.L. Rev. 463 (1976).

The majority also does not hold that fourth amendment issues were automatically exhausted once the initial private search was completed. The Court scrutinizes separately whether the government's viewing of the films discovered in the private search was an additional "different" search, concluding that when the FBI agent screened films, the obscene content of which had already been ascertained by the employees of L'Eggs, he "did not 'change the nature of the search [4] ' ". The majority refuses, however, to test the government's acquisition of the films against the same standard. Without examining the nature of the FBI's actions in taking and retaining the fruits of the private search, the Court holds that it was not a "seizure"; it was no more than a passive acceptance of an accomplished fact.

The government's acquisition of the fruits of the private search must be termed a "seizure" because it interfered with the

---

3. Professor Monahan suggests a similar analysis with respect to warrantless arrests. Viewing the first amendment as a source of restrictions upon the power of the police to seize persons as well as things, he argues that the police should be prohibited from arresting those committing offenses in their presence when the offenders are exhibitors or distributors of arguably first amendment protected matter. "Functionally, an arrest resembles a nonjudicially imposed injunction against certain conduct; . . . here, there is not even

the barest judicial inquiry before the damage is done." Monahan, First Amendment "Due Process", 83 Harv.L.Rev. 518, 538 (1970).

4. Although I believe that the FBI's examination of the films at the L'Eggs' office was not an independent "search" subject to the fourth amendment, I cannot agree with the majority's conclusion that the later screening of the films at the office of the FBI was merely a continuation of the private search. *See* text pp. 803–804 *infra*.

defendants' interest in the films in a new and different way. "It constituted a deprivation of the defendants' property interests". *See* Note, *Private Searches and Seizures, supra* at 469. The defendants had a legitimate possessory interest in the films acquired by the FBI until a judge, jury, or neutral magistrate issuing a warrant established probable obscenity. They had, therefore, a reasonable expectation of freedom from governmental interference with these films. "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, book II, Ch. I, and one who owns or lawfully possesses . . . property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *Rakas v. Illinois,* 1978, —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387, 401, n. 12. This expectation is protected by the fourth amendment.

It is true that when the employees of L'Eggs took the packages from the common carrier and opened them, the defendants' ordinary privacy interest in the packages, in the sense of their desire to insulate the contents of the packages from the eyes of others, was infringed. That interest was not affected in any new way by the FBI's observance of the contents of the packages at the L'Eggs office.[5] But the defendants' retained a possessory interest in the films themselves, because they had a reasonable expectation that the packages would be retrieved after misdelivery or returned by the private parties to the common carrier. They also had a reasonable expectation that the films would be returned to them by the government pending a judicial determination of obscenity. Thus, they had a right to exclude the government from taking possession of the films. When the FBI appropriated the films, it abruptly and completely interfered with these legitimate expectations. The appropriation of the films was, therefore, a "seizure".

The majority contends, nevertheless, that the Eighth Circuit's characterization, in *Kelly,* of the government's acceptance of the films as a "seizure" contradicts a long line of decisions by the Supreme Court and this Circuit. None of the cases cited by the majority, except *Sherwin v. United States,* 9 Cir. 1976, 539 F.2d 1, addresses the taking of material presumptively protected by the first amendment. And it is worth noting that, in *Sherwin,* the FBI immediately obtained a warrant to seize a shipment of books after it accepted two copies of printed material discovered in the private search. Furthermore, none of the cases cited by the majority undertakes a separate fourth amendment analysis of the government's acquisition of the items discovered in the private search.

Over fifty years ago the Supreme Court held in *Burdeau v. McDowell, supra,* over a dissent by Justices Brandeis and Holmes, that papers stolen by a thief and turned over to the government could be used as evidence at trial. The Court did not explicitly consider whether the government's acceptance of the papers was a seizure. Commentators have cast doubt on the continued vitality of the *Burdeau* rule in its broadest sense. It permits the government to accomplish circuitously what it could not accomplish directly. In other words, it is the twin of the "silver platter" doctrine that allowed federal prosecutors to use illegal evidence independently obtained by state and local officers. *See generally* Baade, *Illegally Obtained Evidence in Criminal and Civil Cases: A Comparative Study of a Classic Mismatch,* II, 52 Tex.L.Rev. 621, 661 (1974); Note, *The Fourth Amendment Right of Privacy: Mapping the Future,* 53 Va.L.Rev. 1314, 1336–59 (1969). The "silver platter" doctrine was abandoned nearly thirty years after *Burdeau* was decided. *Elkins v. United States,* 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669. Moreover, when *Burdeau* was decided, there were few justifications for warrantless seizures.

5. *See* note 4 *supra.*

"The failure of *Burdeau* to subject the government's acceptance of privately discovered objects to fourth amendment analysis gave the police a desirable freedom of action. Under current fourth amendment doctrine, the exceptions to the warrant requirement . . . permit the police to take immediate action where their protective and law enforcement duties most demand it." Note, *Private Searches and Seizures, supra,* at 469.

The Fifth Circuit cases cited by the majority are primarily concerned with whether there was a "separate or additional *search*" by the government. *See United States v. Blanton,* 5 Cir. 1973, 479 F.2d 327, 328 (emphasis added); *United States v. Lamar,* 5 Cir. 1977, 545 F.2d 488. The majority argues, however, that the introduction into evidence of the fruits of the private search would have been impossible in each of these cases unless the government's acceptance of the articles turned over by the private parties was implicitly immunized from the fourth amendment. Yet in each of the cases the actual seizure of the items can be justified under traditional exceptions for warrantless seizures. For example, in *Lamar,* an airport official discovered heroin in a bag left by a passenger at the airport. He showed the contents of the bag to the police. When the passenger reclaimed the bag later that night, he was arrested. The bag could have been taken into possession by the police as an incident to a lawful arrest.[6]

In this case, the warrantless seizure cannot be justified under existing exceptions to the warrant clause. The employees of L'Eggs had no authority to consent to the government's appropriation of the presumptively lawful contents of the package. The seizure cannot be justified under the plain view doctrine. *See United States v. Kelly,* 8 Cir. 1976, 529 F.2d at 1372–73. There were no exigent circumstances necessitating immediate action. The FBI had ample opportunity to secure a warrant on the basis of an affidavit by either the FBI agents or the employees of L'Eggs. The seizure was, therefore, unreasonable.

## IV.

When evidence is seized in violation of the fourth amendment, the constitutional remedy is the suppression of the illegally obtained evidence. The exclusion of the films as evidence, rather than the return of the films to the owners, is the proper remedy in this case. This is true even though the source for characterizing government action as a seizure is primarily the first amendment[7] and even though the principal

6. The FBI's acceptance of a bag containing a silencer, discovered in a private search at the airport, in *United States v. Blanton,* 5 Cir. 1973, 479 F.2d 327, was also "reasonable" because it was incident to a lawful arrest and because exigent circumstances justified the warrantless seizure. 479 F.2d at 328. Thus, other circuits have scrutinized the reasonableness of governmental takings of objects in a private search directly under the fourth amendment. *See, e. g., United States v. Ogden,* 9 Cir. 1973, 485 F.2d 536, 540; *United States v. Tripp,* 9 Cir. 1972, 468 F.2d 569, 570, *cert. denied,* 1973, 410 U.S. 910, 93 S.Ct. 965, 35 L.Ed.2d 272.

7. Many courts, including a panel of this Circuit, have held that " '[w]hen materials are seized in violation of the first amendment, the appropriate remedy is return of the seized property, but not its suppression as evidence at trial' ". *United States v. Bush,* 5 Cir. 1978, 582 F.2d 1016, 1021. *See also United States v. Sherwin,* 9 Cir. 1976, 539 F.2d 1, 8 n. 11; *United States v. Cangiano,* 2 Cir. 1972, 464 F.2d 320, 328, *vacated on other grounds,* 1973, 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023, *on remand,* 2 Cir., 491 F.2d 905, *cert. denied,* 1974, 418 U.S. 934, 94 S.Ct. 3223, 41 L.Ed.2d 1171; *Tyrone, Inc. v. Wilkinson,* 4 Cir. 1969, 410 F.2d 639, 641; *Metzger v. Pearcy,* 7 Cir. 1968, 393 F.2d 202, 204. These cases are concerned with the seizure of expressive matter pursuant to a warrant but without a prior adversary hearing. The courts have reasoned that the exclusionary rule does not apply where a seizure is defective for lack of an adversary hearing because "the primary right involved is the public's First Amendment right of access, rather than the defendant's Fourth Amendment immunity from unreasonable search and seizure". *Huffman v. United States,* 1972, 152 U.S.App.D.C. 238, 244, 470 F.2d 386, 392.

At least one court has recognized, however, that the Supreme Court's decisions in *Heller* and *Roaden* may obliterate any distinction between violations of the first and fourth amendments when a seizure of expressive matter is defective for lack of a determination of probable obscenity by a neutral magistrate. *See*

interest infringed in this case is a possessory one.[8] When the government obtains films discovered in a private search and retains them, without the knowledge of the owner, for a considerable period of time, the remedy of return comes too late. The owners did not know where the films were. Indeed, the government took pains to ensure that the defendants would not be able to locate the films. The defendants could not ask the government to return the films until they were informed that the government had taken possession of their packages. This information was conveyed, at the earliest, more than a year after the films were acquired by the FBI.[9] Moreover, the Supreme Court has implicitly recognized, in *Roaden*, that the exclusionary rule is the most effective deterrent to unlawful government action affecting freedom of expression. Observing that the " 'use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new. . . .' " 413 U.S. at 506, 93 S.Ct. at 2802, *citing Marcus v. Search Warrant of Property*, 1961, 367 U.S. 717, 729, 81 S.Ct. 1708, 6 L.Ed.2d 1127, the Court reversed a conviction based on the admission into evidence of films seized incident to a lawful arrest. Therefore, I would reverse the convictions of the defendants in this case.

### V.

I would also reverse the convictions of the defendants on the ground that the FBI conducted an independent search, prohibited by the fourth amendment, after acquiring the films.

Relying on language in *United States v. Haes*, 8 Cir. 1977, 551 F.2d 767, the majority holds that the screening of the films on a projector at the office of the FBI was not a separate, independent search because the L'Eggs employees, unlike the private searches in *Haes*, had already ascertained the nature of the films from the box covers and were able to make "a determination of possible obscenity prior to turning the films over to the FBI." 551 F.2d at 772. The "sense impressions or legal conclusions" of the employees of L'Eggs have no place in determining whether the FBI agents conducted a new or different search. *See United States v. Haes*, 551 F.2d at 773 (Webster, J., dissenting). The question whether the films were obscene bears only on the issue of probable cause to search and seize the films; and that determination must be made by a neutral magistrate issuing a warrant.

Nor can I agree with the majority that the FBI's viewing of the films on a screen was merely a continuation of the private parties' observation of the box covers because, as it turned out, the covers accurately reflected their contents. The two-month

*United States v. Pryba*, 1974, 163 U.S.App.D.C. 389, 402, 502 F.2d 391, 404 n. 97.

**8.** In *Sherwin*, the Ninth Circuit Court of Appeals suggested that "when objects found in a private search are turned over to the government, then, only the property interests of the owner are implicated. A motion for return of the objects is a proper means of asserting these interests". 539 F.2d at 8, n. 10. Because, according to the Sherwin court, " 'the principal object of the Fourth Amendment is the protection of privacy rather than property,' " *Warden v. Hayden*, 1967, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782, . . . "[e]ven when there is a governmental seizure, suppression as evidence may not be the proper remedy if only property rights are affected and there has been no governmental invasion of privacy." 539 F.2d at 8, n. 10.

The *Sherwin* court's preference for the remedy of return of the objects rather than their

exclusion from evidence at trial is based on a mistaken view that possessory interests have no role in delineating reasonable expectations of privacy. On the contrary, recent Supreme Court decisions have emphasized that there is no abstract concept of privacy and that the concept of legitimate property interests can define more concretely the scope of the fourth amendment. *See, e. g. Rakas v. Illinois*, 1978, —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387, *quoted* in text, p. 801, *supra.*

**9.** Return of the objects may have been an appropriate remedy in the circumstances of *Sherwin*. In that case, the owners were immediately informed that the government had taken possession of two copies of obscene material. Moreover, when the FBI applied for a warrant the following day, to seize the remainder of the shipment, the magistrate ordered that notice be given to the defendants.

hiatus between the private search and the governmental screening negates any assumption that one continuous search took place. *Cf. Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 458, 464, 91 S.Ct. 2022, 29 L.Ed.2d 564. Each of the cases cited by the majority deal, instead, with governmental viewing of material immediately after being called to the scene of the private search by the private parties. *See United States v. McDaniel*, 5 Cir. 1978, 574 F.2d 1224; *United States v. Blanton*, 5 Cir. 1973, 479 F.2d 327; *United States v. Pryba*, 1974, 163 U.S.App.D.C. 389, 399, 502 F.2d 391, 401; *United States v. Ford*, 10 Cir. 1975, 525 F.2d 1308, 1312. Second, as in *Haes*, the FBI's actions in viewing the films two months later must be characterized as "initiating and carrying out their own inspection of the films for their own purposes." 551 F.2d at 771. If the descriptions on the box covers are an infallible guide to the contents of the films there would have been no need to retain the films for two months before making them available to the United States Attorney's office.

Contrary to the majority, I see no basis for distinguishing the Supreme Court's decision in *United States v. Chadwick*, 1977, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538, from the instant case. See note 7 of the majority opinion. In *Chadwick*, the Supreme Court held that the FBI could not search the contents of a footlocker after it took exclusive custody of the item without obtaining a warrant. Before the FBI took exclusive possession of the items in this case, the L'Eggs employees had viewed the film boxes but had not opened the boxes or viewed their contents. True, there was probable cause to believe that the boxes contained obscene films. But in *Chadwick*, too, there was probable cause to believe that the footlocker contained contraband—and the search validated this assumption. In this case, therefore, as in *Chadwick*, a judicial warrant must be obtained before the containers can be searched.

### VI.

The *Burdeau* rule has spawned much critical literature.[10] Today, the Court extends that rule into an area where the constitutional requirements of the fourth amendment are to be "accorded the most scrupulous exactitude". *Stanford v. Texas*, 1965, 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431. Placing the government's acceptance of expressive materials outside the scope of the fourth amendment, by "cast[ing] the government in the role of a passive receiver . . . absolve[s] the government of any first amendment responsibilities or restrictions . . . [It] allows for the possibility of government-sanctioned private censorship without judicial supervision." Note, *Private Searches and Seizures, supra* at 467. In short, the majority rule frustrates the Supreme Court's efforts to utilize the fourth amendment as a source of procedural guarantees aimed at controlling governmental action that affects freedom of expression. The approach of the Eighth Circuit Court of Appeals in *Kelly*, which subjects the government's taking of expressive materials discovered in a private search to the scrutiny of the fourth amendment, properly guards both the first amendment rights and the privacy interests of absent third parties.

Therefore, I respectfully dissent.

---

10. *See, e. g.,* Black, *Burdeau v. McDowell—A Judicial Milepost on the Road to Absolution,* 12 B.U.L.Rev. 32 (1932); Note, *Seizures by Private Parties: Exclusion in Criminal Cases,* 19 Stan. L.Rev. 608 (1967); Note, *The Fourth Amendment Right of Privacy: Mapping the Future,* 53 Va.L.Rev. 1314, 1336–59 (1969).