UNITED STATES of America, Appellee,

v.

Richard Alan HAES, d/b/a H & H Distributing Co., Appellant.

No. 76–1784.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1977.

Decided March 16, 1977.

Rehearing Denied May 17, 1977.

Raymond Rosenberg, Des Moines, Iowa, for appellant.

Paul A. Zoss, Asst. U. S. Atty., Des Moines, Iowa, for appellee; Name appearing on brief is George H. Perry, former U. S. Atty., Des Moines, Iowa on brief.

Before LAY, ROSS and WEBSTER, Circuit Judges.

ROSS, Circuit Judge.

Richard A. Haes appeals his conviction of three counts: for interstate transportation of an obscene motion picture, 18 U.S.C. § 2 and § 1465; for use of a common carrier to carry an obscene motion picture, 18 U.S.C. § 2 and § 1462; and for conspiracy to

violate the same provisions, 18 U.S.C. § 371. Haes was indicted on twelve other counts but the jury was only able to reach a verdict on these three. The convictions rest on the determination that the film "Masters of Discipline" is obscene, a film seized by the government in a search of Haes' office in Des Moines. Haes raises three issues on appeal to this court: first, the admissibility of the evidence seized in the search of Haes' office; second, whether a proper foundation was established for the submission of the film, and third, whether the proper contemporary community standards were applied in this case.

*Facts.*

The district court made the following findings of fact from the suppression hearing, none of which we find to be clearly erroneous. A package marked as containing printed matter and addressed to Ace Tapes and Records, Denver, Colorado, was shipped from Des Moines to Denver via Emery Air Freight and was to be held for airport pickup in the Denver Emery Air Freight office. When the consignee, Ace Tapes and Records, could not be located, the Emery operations supervisor, Charles Clouser, opened the package looking for further identification in order to locate the consignee, a normal company procedure in such cases. Instead of printed material, Clouser found the reels of 16 millimeter film, one labeled "Sex is My Bag," and the other labeled "Flaming Youth."

A caller to the Emery office requested that the package be delivered to the Blue Bird Theater, but was told that the package had not been located.

Clouser contacted the FBI and related these matters to Special Agent Coquillard who indicated that he would go to the Emery office to view the films. The record reflects that the Emery agents felt that they should hold the carton until the FBI arrived in order to be voluntarily cooperative, though the district court found no evidence that the FBI had specifically requested Emery to take any particular steps regarding the disposition of the package.

Special Agent Coquillard and another agent took a projector with them to the Emery office that evening to view the films. Farley, the night supervisor, left the room and the agents viewed approximately 30 minutes of each film, determining that each contained hard core pornography. They marked the leaders of each film for identification purposes and informed Farley that he could either hold the films at the Emery office where, after procuring a warrant, they would seize the package, or Farley could deliver the films to the consignee, and the FBI agents would serve the warrant at that address. Farley decided to hold the package at the office.

The next day, after a warrant was obtained, the package was seized from the freight office, and on the basis of information contained therein, the FBI procured a warrant and searched the offices of Richard Haes in Des Moines a week later. During that search, the FBI seized a copy of "Masters of Discipline," the film in question here.

*Standing.*

As a threshold issue, the government challenges the trial court's determination that Haes had standing to challenge the legality of the Denver search and seizure. We agree with the trial court and find that Haes has standing.

Under our analysis in *United States v. Kelly,* 529 F.2d 1365, 1369 (8th Cir. 1976) the "victim" of a search and seizure could establish a sufficient interest to constitute standing "if he has an adequate possessory or proprietary interest in the place or object searched" and if this assertion of a property interest is supported by an expectation of privacy. The "victim" of the search in the instant case is the individual who directed that the films be shipped in interstate commerce. The government concedes that the films were shipped pursuant to Haes' directions and were owned by him. In addition, Haes leased the films to theaters thereby maintaining his proprietary interest throughout the transport. Clearly, then, Haes is the "victim" of the search and

has the requisite proprietary interest to assert standing. In regard to the expectation of privacy requirement, we stated in *Kelly* that "a defendant's expectation of privacy should not be deemed unreasonable merely * * * because of a right of [a freight carrier] to inspect packages." *Id.*, 529 F.2d at 1370 (citations omitted).

### The Admissibility of the Film "Masters of Discipline."

Haes contends, *inter alia,* that the search of his offices in Des Moines, Iowa, and the consequent seizure of the film "Masters of Discipline" was tainted by the alleged prior illegal search of the package shipped to Denver via Emery Air Freight and must, therefore, be excluded under the fourth amendment. We agree.

The fourth amendment claims asserted here must be evaluated in conjunction with first amendment protections of printed materials and in this case, films. As stated in *United States v. Kelly, supra,* 529 F.2d at 1372, "The proper seizure of books and magazines, which are presumptively protected by the First Amendment, demands a greater adherence to the Fourth Amendment warrant requirement. *Roaden v. Kentucky, supra,* 413 U.S. at 504, 93 S.Ct. 2796 [37 L.Ed.2d 757], * * *" (other citations omitted).

■ The search and seizure of property by a private individual without any governmental involvement is not subject to the dictates of the exclusionary rule. *Burdeau v. McDowell,* 256 U.S. 465, 467, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). The courts have engaged in a two prong analysis of "allegedly" private searches, however, separately analyzing the search aspect apart from the actual seizure in order to determine whether there was sufficient governmental participation in either aspect to require fourth amendment protection. *See United States v. Sherwin,* 539 F.2d 1, 6–7 (9th Cir. 1976), *United States v. Kelly, supra,* 529 F.2d at 1371. Thus, as in *Sherwin* and *Kelly,* when the search was held to be a private search, the inquiry then focused on the nature of the seizure and whether it passed constitu-

tional muster. In this case, though the police obtained a warrant prior to *seizing* the films, our inquiry into the nature of the search is not obviated.

■ The distinction between a private search and a governmental search has been considered in several cases. It has been held that where a search is physically conducted by a private individual but only at the government's initiation and under their guidance it is not a private search. *United States v. Newton,* 510 F.2d 1149, 1153 (7th Cir. 1975); *Corngold v. United States,* 367 F.2d 1, 5 (9th Cir. 1966). Searches, not so clearly governmental however, must be judged according to the nature of the governmental participation in the search process.

In *United States v. Entringer,* 532 F.2d 634 (8th Cir. 1976), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1977), TWA made a routine inventory of an apparently pilfered shipment pursuant to the company's policy. Given the possibility of a theft from an interstate shipment, the FBI was contacted and was present during the inventory by TWA. The FBI only observed TWA's inventory and did not participate in the search in any other manner. The court found that the mere observation by the FBI of the activities of TWA employees did not alter the private nature of the search. Similarly, in *United States v. Pryba,* 163 U.S. App.D.C. 389, 502 F.2d 391, 401 (2d Cir. 1974), *cert. denied,* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975), FBI agents provided United Airlines with a projector to view films found by the airlines in their cargo and watched while an airlines official viewed the films. Prior to calling the FBI, the airline official had "eye viewed" two of the films without a projector and had decided they were obscene. *Id.* at 400. The search and the projection of the films was routinely initiated and conducted by United Airlines and was clearly within their authorization as a freight carrier. The FBI did not initiate the action and was simply an observer of a continuation of the search rather than a participant. *See also Gold v. United States,* 378 F.2d 588, 590 (9th Cir.

1967), another case in which the private employees actually looked at the film before calling the FBI. In *United States v. Issod*, 508 F.2d 990, 994 (7th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975), the appellate court remanded the case to the trial court to consider this specific issue of whether the state agent had participated in the search by opening the trunks. Had there been governmental participation of this sort in *Issod*, the appellate court indicated that the government would be chargeable with the search. *Cf. United States v. Cangiano*, 464 F.2d 320, 324 (2d Cir. 1972), *vacated on other grounds*, 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023 (1973), where the FBI agent provided a projector but was not present during the showing.

■ Where there is no government participation in or observation of the initial private search and the government is alerted after contraband has been discovered, the inquiry must be whether the government undertakes any new or different searches when they make a separate inspection. In *United States v. Harding*, 475 F.2d 480, 484 (10th Cir.), *vacated on other grounds*, 414 U.S. 964, 94 S.Ct. 274, 38 L.Ed.2d 211 (1973), the freight agent opened and examined a "suspicious" package. Discovering obscene materials, he contacted the FBI who sent an agent to inspect the package. There was no federal participation in the initial search and the FBI agent merely inspected the contents of the package as the freight agent had done earlier. There was no new or different search by the government agents. *United States v. Sherwin, supra*, 539 F.2d at 6–7, and *United States v. Kelly, supra*, 529 F.2d at 1371 are cases where FBI agents simply inspected the contents of packages of books already opened by the freight agents who had also already inspected the books.

■ But such is not the case here. Emery Air Freight opened the package routinely only to discover the films and alert the FBI. This was unquestionably a private search. However, the private search did *not* include *any* viewing of the films. The further actions by the FBI in bringing a projector to the Emery offices and viewing the films by themselves, extending over a two hour period and without any further participation or prior viewing by Emery employees, changed the nature of the search. The FBI's actions could not be characterized as observing a private individual's search but rather as initiating and carrying out their own inspection of the films for their own purposes. We emphasize that as of the time the films were turned over to the FBI for viewing, the freight employees had not viewed the films and had not attempted to make a decision as to whether or not they were obscene. Under these circumstances, it seems obvious that the *real* search was not made by freight employees but solely by agents of the FBI. The trial court found that the search became a government search at this time but held it to be reasonable and proper "to determine whether there was reasonable cause to believe the law was being violated and did not violate defendant's constitutional rights." In our opinion, the search was a warrantless governmental search and as such is illegal unless an exception to the warrant requirement exists.

■ The government contends that exigent circumstances existed to at least justify the viewing of the films by the agents at the Air Freight office. However, after viewing the films, they proceeded to procure a warrant and indicated to the Emery officials that they were free to deliver the package if they wanted to do so and that the FBI would seize the package from the theater owners. Their argument that they might not be able to find the films later because of the uncertainty of the films' destination fails by their own admission. Furthermore there was nothing to keep them from observing the pickup and delivery of the film, watching the screening of them by the recipient and then securing a warrant. We would feel otherwise if the private search had included any sort of viewing of the films and a determination of

possible obscenity prior to turning the films over to the FBI.[1]

 Finding that the Denver search was illegal, the evidence obtained in that search must be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Since the subsequent search of Haes' office in Des Moines is a direct result of the information obtained in the Denver search, the evidence gathered in the Des Moines search must also be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962). In reaching this result and suppressing the film "Masters of Discipline," we need not reach the other two issues raised by Haes concerning foundation of the submission of the film and the applicable contemporary community standards.

We reverse the trial court's ruling on the suppression of the evidence and remand with directions to dismiss the convictions of Haes on all counts upon which he was convicted.

WEBSTER, Circuit Judge, dissenting.

I respectfully dissent. I agree that appellant had standing under our holding in *United States v. Kelly*, 529 F.2d 1365, 1370 (8th Cir. 1976). My disagreement is with the majority holding that "the *real* search [in Denver] was not made by freight employees but solely by agents of the FBI."

FBI agents brought a projector to the Emery Air Freight office in Denver after being notified that films had been discovered in a lawful private search by Emery Air Freight employees. The contents of the package had been mislabeled as printed matter and a caller had requested that the package be delivered to the Blue Bird Theater, which was not the named consignee. The films were clearly labeled "Sex is my Bag" and "Flaming Youth." The circumstances were such that the FBI agents were warranted in investigating possible violations of federal law. It is the viewing of the films on the projector which the majority sees as being an invalid search by government agents. I disagree.

The Fourth Amendment prohibits *unreasonable* searches and seizures. To characterize the inspection of the film by the FBI agents as an independent search requiring application of the exclusionary rule goes too far, in my opinion, and is an unwarranted extension of *United States v. Kelly, supra*.[1]

Can it be seriously argued that an agent receiving a suspected book or magazine from a freight carrier employee could not reasonably open the publication and peruse its pages to determine whether its contents offended the law? *See United States v. Harding*, 475 F.2d 480 (10th Cir.), *vacated on other grounds*, 414 U.S. 964, 94 S.Ct. 274, 38 L.Ed.2d 211 (1973). Would a government agent who used a magnifying glass or other mechanical aid to identify an object be vulnerable to a claim of an unreasonable search independent of the lawful private search which produced the object? I think clearly not.[2]

---

1. In every case cited in the dissent involving a private search of first amendment material, the private search included a viewing of the books or films by the private employee prior to calling the FBI except *Entringer* in which the TWA inventory and inspection of "advertising material and brochures which graphically illustrated the film's contents" was made in the presence of an FBI agent. In each case thus cited, when the material was handed to the FBI the private employee had tangible evidence upon which to believe that the material was being illegally transported in interstate commerce. Such was not the case here.

1. In *United States v. Kelly*, 529 F.2d 1365 (8th Cir. 1976), FBI agents responded to a series of seven different calls in a two-month period.

The holding dealt with the warrantless *seizure*, not the inspection of obscene materials. In each instance government agents took samples of the books and magazines before the packages were rewrapped and shipped.

2. An airport private search was upheld in a narcotics case notwithstanding the government agents to whom the contents of an open package were shown made certain chemical tests before the package was returned. *United States v. Ford*, 525 F.2d 1308 (10th Cir. 1975). The use of an airport X-ray machine was upheld in *People v. Fritschler*, 81 Misc.2d 106, 364 N.Y.S.2d 801 (Sup.Ct.1975).

The majority seeks to distinguish *United States v. Harding, supra*, because the FBI "merely inspected" the contents of a package

The film in this case was not a means of concealing something else. In looking at the film through a projector, the agents did no more than view the motion pictures in the manner in which they were intended to be viewed.

The cases relied upon by the majority for reversal compel, in my view, an opposite result. In *United States v. Pryba*, 163 U.S. App.D.C. 389, 502 F.2d 391, 401 (1974), *cert. denied*, 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975), as in this case, the search was initiated by private officials. There, as here, the FBI supplied the projector. To distinguish *Pryba* because in that case the agents *watched* rather than operated the projector themselves, or because the airline official had previously "eye viewed" two of the films without a projector, is both unrealistic and unreasonable.

In *Gold v. United States*, 378 F.2d 588, 590 (9th Cir. 1967), the private employees had looked at some of the film, apparently without a projector. Government agents used a projector when called by the freight carrier. The Ninth Circuit upheld the District Court's refusal to suppress this evidence, holding it to be the fruit of a lawful private search. The fact that an employee in *Gold* had looked at the film is irrelevant—the government agents in both cases had the same degree of participation. The agents did not unwrap any packages or

open any boxes.[3] The prior examination by the carrier employees in *Gold* might have provided probable cause to obtain a warrant; it certainly did not alter the fact that the agents simply viewed the films with a projector.[4]

The majority attaches crucial importance to the fact that in all of these cases except *United States v. Entringer*, 532 F.2d 634 (8th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976), the private employee had perused the contents sufficiently to "believe that the material was being illegally transported in interstate commerce." At 772, n.1. I can find no authority, and none has been cited, for such a distinction. If the search by the freight carrier employee was a private search, as the majority concedes it to be, at 771, then the only question to be resolved is whether the conduct of the FBI agents in viewing the film—their only participation—was a "new or different search." The sense impressions or legal conclusions of the private employee have no place in that determination. The significant fact is that the freight carrier employees "made [the film] available to the officers." *United States v. Blanton*, 479 F.2d 327, 328 (5th Cir. 1973). *See Clayton v. United States*, 413 F.2d 297 (9th Cir. 1969), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2204, 26 L.Ed.2d 565 (1970); *Wolf Low v. United States*, 391 F.2d 61 (9th Cir.), *cert. denied*, 393 U.S. 849, 89 S.Ct. 136, 21 L.Ed.2d 119 (1968).[5] No question of proba-

*:* containing obscene written materials. I have found no prior case holding that the use of a projector to view film was any more of a search than inspecting written materials with eyeglasses.

**3.** *Cf. United States v. Issod*, 508 F.2d 990 (7th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975); *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966).

**4.** In *United States v. Sherwin*, 539 F.2d 1 (9th Cir. 1976), government agents were called when apparently obscene books were discovered in a damaged shipment. The agents "view[ed] the materials displayed to them by the manager." 539 F.2d at 7. The Ninth Circuit found no unlawful search from these facts. *United States v. Entringer*, 532 F.2d 634 (8th Cir. 1976), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976) and *United States v.*

*Kelly, supra*, cited by the majority, are inapplicable. Both involved warrantless *seizures*. *See note* 1, *supra*.

**5.** In *Wolf Low*, the Ninth Circuit upheld the use of evidence obtained under the following circumstances:

As we analyze the case, the customs officers made no search at all, within the constitutional meaning of a search. They were notified that if they would come to the airport responsible employees of the airport would show them something which the airport had on view there. They would not have to search for it nor obtain access to any closed container to see it. The customs officers would not know until they looked at the objects what significance, if any, the objects would have for them. When they arrived at

ble cause to seize is presented here because the films were not seized prior to obtaining a warrant. Thus, the prior knowledge of the private employees has no place in the analysis of the FBI conduct. The films were uncovered by the private employees, not the FBI. For the reasons stated, the use of the projector cannot be characterized as a new search.

I do not understand that the two hours spent observing approximately thirty minutes of each film was per se unreasonable; in any event, I cannot say that the time spent in determining whether there was probable cause to obtain a warrant to seize the films was so unreasonably excessive as to constitute an unreasonable search and seizure. The films were left with the freight carrier employee and the agents did not attempt to direct his conduct with respect to release of the films. The marking of the films was a reasonable step for purposes of further identification in the event the agents were able to obtain a warrant to seize them. To hold otherwise would run counter to the encouraged use of search and seizure warrants wherever possible.

Since I would have upheld the District Court's order denying suppression of the films on account of the Denver search, it follows that I do not agree that the search in Des Moines was the product of a prior illegal search, the basis upon which the majority reverses this case. I have carefully considered the other claims made on appeal, which the majority found unnecessary to address in light of its holding, and consider them likewise to be without merit. I would affirm the judgment of conviction.

the airport the airport employees or one of the custom's officers, opened the suitcases,

which had been left unlocked so that they 391 F.2d at 63.