UNITED STATES of America, Plaintiff,

v.

Don Lewis CHURCH, Defendant.

Crim. No. 83–50022–01.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Feb. 1, 1984.

W. Asa Hutchinson, U.S. Atty., Fort Smith, Ark., for plaintiff.

James F. Dickson and W.B. Putman, Fayetteville, Ark., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Defendant, Don Lewis Church, a/k/a David Cooper, was indicted by a federal grand jury for the Western District of Arkansas on three counts of violating 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 844(a). Specifically, in Count I he is charged with knowingly and intentionally possessing with intent to distribute cocaine, a Schedule II controlled substance. Count II charges him with unlawfully, knowingly and intentionally possessing cocaine, and in Count III he is charged with possessing hashish, a Schedule I controlled substance.

Defendant filed motions to suppress all evidence obtained under the circumstances described below. An evidentiary hearing was held on January 12 and 13, 1984, and the Court is prepared to rule.

The facts necessary to a determination of the issues raised by the motions are not

significantly in dispute. In July of 1983, the defendant, using the name David Cooper, rented space number 99 of Clark's Mini-Storage Units on Highway 71 in Bella Vista, Arkansas, owned and operated by Byrdell Clark. According to the testimony at the hearing, he obtained possession of the unit around the middle of July, 1983, and paid two months rent.

Mr. Clark testified at the hearing and related the events which later transpired which ultimately resulted in the arrest of Cooper who, according to law enforcement agents, turned out to be Don Lewis Church, allegedly a fugitive from the state of California since 1972 where he had failed to appear for trial on two counts of possession and detonation of destructive devices with intent to terrify persons and destroy property (the alleged bombing of a Bank of America facility), where he had posted and forfeited a cash bond of $25,000.00.

According to the testimony of Mr. Clark, some time shortly after September 15, 1983, Clark believed that the rent on unit 99 had become delinquent. Church's attorneys at the hearing produced a check which may raise some doubt about whether the rent was actually in arrears, but the Court finds that it makes no difference since it is undisputed that Mr. Clark at least thought that it was. In any event, there is certainly no evidence from which the Court could infer that any law enforcement agent in any way participated in the actions by Clark after he believed that the rent on the unit was due and unpaid.

After believing that the rent was delinquent, and having no address or phone number for the person he knew as David Cooper, Clark proceeded to the rental unit. He first looked through some slats from an adjoining unit and saw nothing in the unit other than some plastic garbage bags. Then, using bolt cutters that he brought with him, he cut Church's padlock from the doorway and entered the unit. He discovered only a padlocked footlocker, some automotive shock absorbers, and the plastic trashbags he had earlier seen. Mr. Clark then, using the bolt cutters, cut the padlock on the footlocker. He stated that his reason for doing so was to determine the contents so that he could decide what to do with them.

Upon opening the footlocker, he discovered some more large green trashbags which he opened. Inside these bags were approximately 39 small clear plastic bags with a "ziplock" top filled with a white powdery substance. The bags were described as being approximately five inches by seven inches.

Clark, who impressed the Court during his testimony as a man somewhat tormented by the uninvited circumstances which he suddenly found thrust upon him, closed the footlocker and left the unit, padlocking the door of the unit with a lock belonging to him. Cooper (now known to be Church) did not have a key to the lock left on the door by Clark.

Clark testified that he spent most of the night thinking about what he should do, a claim that, after viewing Mr. Clark's testimony, the Court has no difficulty in believing. He says that he had a strong suspicion that the substance was illegal and that he frankly did not know what to do about it. He considered reporting the matter to the police, but he was concerned about the "bad press" that he and his units would get if he did so. The next morning, he returned to the unit and again opened the footlocker. He removed at least one of the packages containing the white powder and tried to burn it, but determined that it would not burn. He then took a five-gallon bucket, filled it about half full of water, and, removing one or more of the packages, he determined whether the powder would dissolve in the water. He learned that it would, so he systematically opened each of the packages and mixed their contents with water, using several half full buckets of water. He considered pouring the solution into a nearby stream, but, not knowing for certain what the powdery substance was, he was fearful of polluting the stream. He finally decided to pour the solution on the ground behind his rental units.

After doing this, he returned the empty plastic bags, with some residue remaining, to the larger trashbags and placed them in the footlocker. He apparently did not re-lock the footlocker, but when he left unit 99 he again placed his padlock on the door. Apparently at that time, or at some subsequent time, he also left a note in unit 99 directed to Cooper, advising that he had thought that Cooper had abandoned the contents of the unit, and explaining what he had done.

On Saturday, September 24, Mr. Clark's wife received a call from a person who identified himself as David Cooper. This caller stated that he had been to the unit and had found someone else's lock on it and wanted to know what had occurred. Mr. Clark returned home and talked by phone with the person who had identified himself as Cooper and was advised that the rent had, in fact, been paid and that Clark should check his records. Clark offered to go to the rental units with him that night to "straighten things out" and Cooper declined, saying that he had a dinner engagement. Arrangements were made for them to meet the next day, September 25, at 11:00 a.m., a Sunday morning. Again Mr. Clark spent the night worrying about the problem that had been thrust upon him. Early the next morning he contacted the Benton County, Arkansas, Sheriff's Office and asked that they come to his units because he wanted to discuss a matter with them and show them what he had found. At approximately 8:30 that morning, Sheriff Don Rystrom and Lieutenant Don Townsend arrived at the units. Mr. Clark explained what had transpired and described the white powdery substance to Lieutenant Townsend, who had approximately eleven years of law enforcement experience with illicit drugs. Clark indicated to Townsend that he believed that the white powder might be an illegal substance.

Clark then took Townsend into rental unit 99, lifted the lid on the now unlocked footlocker, and showed Townsend the plastic bags which had contained the substance, and which still contained residue. Townsend took the plastic bags and asked Clark if there were more. Clark then remembered that he had five of the small bags at home which he had taken there the day that he attempted to dispose of the substance. He told Townsend that he had taken the bags as "insurance" in the event that the person that he knew as Cooper came back and tried to cause him trouble because of the actions that he had taken.

After taking the bags, Townsend next went to the area behind the rental units where the solution had been dumped and took soil samples and found a "white glob" of the substance on the ground. After having viewed the bags and the substance, Townsend was relatively certain that it was a controlled substance, either cocaine or methamphetamine. He then took the bags and the samples to his office and ran a field test for cocaine, methamphetamine, and barbiturates. The barbiturate and methamphetamine tests were negative, but the test for cocaine was positive. He then called for the aid of other law enforcement agents who "staked out" the building, and waited for the person then known as Cooper to arrive. At almost exactly 11:00 a.m., this individual arrived in a pickup truck and when he exited the truck, he was approached by Lt. Townsend and asked if he was David Cooper. He replied in the affirmative and he was then asked if he was the person who was renting unit 99. He again replied that he was, so Townsend, who did not have a "rights card" with him, gave him his rights, as best he could, from memory. He then arrested the person then known as David Cooper.

After the arrest, he "patted him down" and found an address book and some other bits of paper, none of which seemed to have much significance to the issues raised by the motions to suppress. However, during the "patdown" Cooper was asked if the police officers could look in his vehicle. He replied that they could and that they would not find anything. The pickup truck was then searched and again several paper items were discovered, only one of which has any significance to the issues to be decided now. In the pickup, the law en-

forcement agents found a bill from a well driller indicating that he had drilled a well for Cooper. Subsequent investigation located the well driller and from this information, the agents located real property on which was located a mobile home in which Church had been residing, apparently with at least one other individual, a female, and probably a child. A search warrant was obtained to search the mobile home, and a number of items were found and seized, including a quantity of hashish which resulted in the charges contained in Count III of the indictment.

The defendant contends that all evidence obtained prior to and at the time of the arrest should be suppressed because the law enforcement agents, not having obtained a search warrant to permit such searches, violated his rights granted by the Fourth Amendment to the United States Constitution which, in effect, prohibits unlawful searches and seizures. He likewise argues that the evidence obtained during the search of his mobile home, even though done pursuant to a search warrant, must be suppressed because such search and the evidence obtained thereby were "fruits" of the earlier unlawful search.

Because this Court believes that many lay persons, and some lawyers, misunderstand the function of this Court in ruling on issues such as the one before it, it deems it appropriate to briefly discuss what it perceives to be its function in the federal judicial system created by Article III of the United States Constitution. It is obvious that federal district courts are the "bottom rung" of the judicial system created by the Constitution. Since that is the case, this Court firmly believes that its function is clear. Its duty and obligation is to attempt to clearly perceive what the law is at the particular moment, and once clearly perceived, to honestly and forthrightly apply "the law" irrespective of what its views may be about the "rightness" or "wrongness" of it. Federal district courts do not have the right to disregard the pronouncements of the Court of Appeals for the circuit in which it sits, nor the clearly perceived pronouncements of the United States Supreme Court. When either of those courts clearly speak on a particular subject, it is this Court's duty to follow the law as announced until it is changed, and it may not decide that those decisions are "wrong," nor may it speculate that the law may be different next week, next month or next year. Its function is to apply the law as it exists at that time irrespective of what its views may be as to what the law should be. The system will not properly work otherwise.

Applying what this Court believes to be its function as set forth above to the facts of this case, it becomes obvious that it makes little difference whether this Court believes that the law on searches and seizures as pronounced by the United States Court of Appeals for the Eighth Circuit and the United States Supreme Court is good law or bad law. It is of no consequence that this Court may feel that the public interest would be best served in this case for Church to go to trial and be tried by twelve jurors who have access to all of the evidence at hand. It is of no consequence that this Court may believe, as did Justice Blackmun in his dissenting opinion in *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), (a case to be discussed in more detail later), that defendant had no legitimate expectation of privacy which prohibits a law enforcement agent from confirming his well-founded suspicion that a powdery white substance packed in "baggies" which rightfully came into his possession is, indeed, an illegal substance by performing a simple test on it. It may be that the Court is firmly convinced that it makes no sense to hold that Church had a legitimate expectation of privacy preventing discovery of the molecular or atomic structure of the substance rightfully in the hands of the officers.

In other words, if this Court were free to decide what the law ought to be, it would reach a different decision than the one that will be reached in this case. However, because of the reasons set forth above, this Court does not have that right and is not

free to do so and is firmly convinced that it would be a violation of its oath to even attempt to usurp the function of courts superior to it.

After considerable research and some soul-searching, this Court believes that it clearly perceives the law that must be applied to this case, as it now exists. It also makes little difference that there are indications, as recognized by Judge Becker in a special concurring opinion in *United States v. Jacobsen,* 683 F.2d 296 (8th Cir.1982), that it is more than possible that the United States Supreme Court is presently in the process of reevaluating its view on searches and seizures, and that Justice Blackmun's dissent in *Walter, supra,* may soon become the law in this field. It simply is not now the law, and this Court has no right under the system to presume that it ever will be. Instead, it must apply the law that exists at this moment.

■ With those principles in mind, the Court will now apply what it perceives to be the law to the facts of this case. It is now well settled that where a search is made by a private person, on his own initiative and for his own purposes, the Fourth Amendment is not implicated because the activities of individuals or non-governmental entities are not proscribed by such amendment. *United States v. Pryba,* 502 F.2d 391 (D.C.Cir.1974); *United States v. DeBerry,* 487 F.2d 448 (2d Cir.1973); *United States v. Burton,* 475 F.2d 469 (8th Cir.1973).

In the recent case of *United States v. Roberts,* 644 F.2d 683 (8th Cir.1980), the Court had occasion to discuss the question of private searches as opposed to governmental searches. The facts of that case are quite similar to those in this one. In that case, the defendant was the lessee of certain storage units operated by the same proprietor in both Independence and Gladstone, Missouri. The storage units, just as in this case, were generally padlocked by the lessee's own padlock. On a particular evening in November of 1978, the employees at both locations found several units that were unlocked. The general manager

of the operation went into the unlocked units in Gladstone and found in one of them what appeared to be a large bag of marijuana. The manager closed the door to that storage unit and, along with a private investigator, went to the Independence operation. At that location, he again discovered broken padlocks near several unlocked storage units and discovered some boxes which appeared to contain marijuana. He called the Kansas City police and took officers to the Independence location and described to them and showed to them what he had found. The officers entered the storage unit and seized what was later identified to be approximately 900 pounds of marijuana.

The following morning, officers met the manager at the Gladstone location and he took officers into that unit. They seized what was later found to be approximately 56 pounds of marijuana.

The officers did not have warrants to search either of the units. The lessee of the units, after being charged with possession of marijuana, moved to suppress the evidence.

The Court, after finding that officers did not participate in the activities resulting in finding the marijuana in either unit, held that the evidence obtained in the search by officers of one of the units would be suppressed, but not the other. The Court held that the discovery in each instance was "clearly private" and was thus "clearly proper." However, the Court remained concerned about the officers' ultimate actions of taking physical possession of the respective quantities of contraband. The Court finally perceived a difference between the two "searches." The manager, after discovering the marijuana at the Gladstone location, merely bolted a door and took no action to prevent the owner and lessee from claiming possession of the contraband. For this reason, the Court found that the private individual had not seized it and that the action of the law enforcement agents in taking control of the marijuana at that location, without a warrant, was in violation of Fourth Amend-

ment rights. On the other hand, because the manager had posted guards at the Independence location after he discovered the marijuana, the Court held that the private individual had not only "discovered" it, but also had "seized" it. Thus, the officers' actions in taking possession of the marijuana without a warrant at Gladstone were in violation of the Fourth Amendment to the Constitution, but their actions in taking possession at Independence were not. This decision was an *en banc* decision and three judges (Bright, Lay and McMillian) dissented, contending that the evidence obtained at both locations should be suppressed because of what they believed to be violation of the defendant's constitutional rights.

■ Applying the holding of the *Roberts* case to this case, the Court has little difficulty in holding that the actions of Clark were both a private search and a private seizure of the discovered cocaine, and that the law enforcement agents played no part in either the search or seizure. From the facts set forth above, it is obvious that Clark cut the locks from the unit and the footlocker and found the contraband while acting for his own purposes. There was no participation in any respect by law enforcement agents. Likewise, after finding the cocaine, he took possession of it, mixed it with water, and dumped it. It could hardly be said that he did not, under the rationale of *Roberts*, "seize it."

Not only is his taking possession, mixing it, and dumping it an indication that he had taken absolute control of it prior to law enforcement agents becoming involved, he testified that he also put his own lock on the unit door to prohibit anyone from going into the unit. During persistent cross-examination of Mr. Clark by defendant's counsel, he testified that he would not have allowed Church to reclaim the empty bags, with residue, if he had shown up and demanded that he be allowed to do so because, among other reasons, he was "afraid he would kill him." In any event, Clark's actions speak louder than words could. The fact is that as soon as Church (or Cooper) called him, he made arrange-

ments to meet him the next morning, but then, almost immediately, made arrangements to meet law enforcement agents first. Thus, it is clear that he had, at no time, any intention of allowing Cooper to retain possession of his property. Thus, he clearly seized it and handed it over to the law enforcement agents. Without any question, the possession obtained by the law enforcement agents was proper and did not violate any Fourth Amendment rights of defendant.

■ However, this holding does not completely answer the question. As indicated above, it may seem logical that a law enforcement agent, having properly obtained possession of a white powdery substance, may find out what he has by doing rather simple field tests on it. The Court is convinced that that is not presently the law in this circuit because of the holding in *United States v. Haes*, 551 F.2d 767 (8th Cir. 1977), and *United States v. Jacobsen, supra*, nor in the United States because of the holding of the United States Supreme Court in *Walter v. United States, supra*. This Court is convinced that *Walter, supra*, clearly says what the Court of Appeals for the Eighth Circuit says that it said in the *Jacobsen* opinion, but, even if that was not the case, this Court would be bound by the circuit court's reading of that case.

In the 1977 *Haes* case, *supra*, a package marked as containing printed matter was shipped from Des Moines, Iowa, to Denver via Emery Air Freight. When the consignee could not be located, the Emery operations supervisor opened the package looking for further identification in order to locate the consignee. Instead of printed material, the manager found two reels of 16 mm. film, one labeled "Sex Is My Bag," and the other labeled "Flaming Youth." The FBI was contacted, and agents took a projector to the Emery office and viewed about 30 minutes of each film. They then marked the leaders of each film for identification purposes. The next day, after a warrant was obtained, the packages were seized. On the basis of information con-

tained in the packages, the FBI also secured a search warrant and searched the offices of Richard Haes in Des Moines a week later where they discovered and seized a copy of a film entitled "Masters of Discipline."

The Court, after first finding that the government was not involved in the initial searches conducted by Emery, held:

Emery Air Freight opened the package routinely only to discover the films and alert the FBI. This was unquestionably a private search. However, the private search did not include any viewing of the films. The further actions by the FBI in bringing a projector to the Emery offices and viewing the films by themselves, extending over a two-hour period and without any further participation or prior viewing by Emery employees, changed the nature of the search. The FBI's actions could not be characterized as observing a private individual's search, but rather as initiating and carrying out their own inspection of the films for their own purposes.

The Court held that the film, even though rightfully in the possession of the law enforcement agents, could not be viewed by them prior to a warrant being obtained, and that such action in doing so violated Haes' Fourth Amendment rights. The evidence was suppressed.

Even though the *Haes* case predated the United States Supreme Court decision in the *Walter* case by over three years, it is obvious from a mere reading of that case that the Court of Appeals for the Eighth Circuit almost uncannily had predicted the precise decision that the United States Supreme Court would reach on this issue when faced with it. In the *Walter* case, twelve large, securely sealed packages, containing 871 boxes of 8 mm. film, were shipped by private carrier from St. Petersburg, Florida, to Atlanta, Georgia. The shipment was addressed to "Leggs, Inc.," but was mistakenly delivered to a substation in the suburbs of Atlanta where "L'eggs Products, Inc.," regularly received deliveries. Employees of the latter company opened each of the packages and found labels on the individual film boxes containing suggestive drawings and explicit descriptions of homosexual activities. One employee opened one or two of the boxes and attempted, without success, to view portions of the film by holding it up to the light. Shortly thereafter, the FBI was called and the packages were delivered to an agent. Thereafter, without obtaining a warrant, the FBI agents viewed the films with a projector.

In suppressing the evidence, the Court said:

It is perfectly obvious that the agents' reason for viewing the films was to determine whether their owner was guilty of a federal offense. To be sure, the labels on the film boxes gave them probable cause to believe that the films were obscene and that their shipment in interstate commerce had offended the federal criminal code. But the labels were not sufficient to support a conviction and were not mentioned in the indictment. Further investigation—that is to say, a search of the contents of the films—was necessary in order to obtain the evidence which was to be used at trial.

The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents.

In further explaining its holding, the Court said:

The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy. The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection. Since the additional search conducted by the FBI—the screening of the films—was not supported by any justification, it violated that Amendment.

The ruling was a five to four decision with Justice Blackmun issuing a well-rea-

soned dissent, joined in by Justices Powell and Rehnquist. It is the reasoning of this dissent which Judge Becker indicated in his special concurring opinion in *Jacobsen, supra,* may very well become the law in the near future. That belief was certainly not discouraged by the United States Supreme Court's subsequent granting of certiorari in the *Jacobsen* case. —— U.S. ——, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983).

In any event, in July of 1982, the Court of Appeals for the Eighth Circuit decided *Jacobsen, supra,* and a fair reading of that decision can lead to no other conclusion but that it applies *Walter, supra,* correctly. In any event, as pointed out above, it would make no difference whether that is the case, since this Court is bound by decisions of the Court of Appeals for the Eighth Circuit.

In *Jacobsen,* a damaged package was examined by Federal Express. Inside the package was a cardboard box wrapped in brown paper. Inside the box was a tube of duct tape. Inside the tube were four clear plastic bags, one inside the next, the innermost containing white powder. The Drug Enforcement Agency was notified and agents extracted a sample of the powder and conducted a field test on the substance, which turned out to be cocaine. The package was resealed and shipped. A warrant was obtained and defendant's home was searched. The trial court refused to suppress. The Court of Appeals for the Eighth Circuit reversed, stating:

> In this case, the Federal Express employees removed the plastic bags from the tube, but did not remove or in any way analyze any of the powder; they subsequently replaced the bags back in the tube. The DEA agents removed the bags, took several samples of the powder, and subjected the samples to tests in order to determine their composition.

> The private search in this case exposed bags of powder, but the Jacobsens' initial reasonable expectation that the package's contents would remain private was not entirely frustrated by the private

search. In *Walter,* Justice Stevens wrote:

> The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy. The private search merely frustrated that expectation in part. It did not strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection.

(citation omitted.)

> The DEA agents' extension of the private search precisely parallels that in *Walter.* In both cases, viewing the objects with unaided vision produced only an inference of criminal activity. In both cases, government agents went beyond the scope of the private search by using mechanical or chemical means to discover the hidden nature of the objects. The governmental activity represents a significant extension of the private searches because it revealed the contents of the films in *Walter and here, the composition of the powder. In the absence of exigent circumstances, which the government does not allege, we hold the agents were required to obtain a warrant authorizing the taking of samples and analysis thereof.* (emphasis added.)

*Jacobsen,* at 299–300.

This Court has no intellectually honest choice but to determine that the *Jacobsen* case is exactly on point and is dispositive of this case. The government argues that the *Jacobsen* reasoning is fallacious and that this Court should adopt reasoning such as that set forth in *United States v. Barry,* 673 F.2d 912 (6th Cir.), *cert. denied,* 459 U.S. 927, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982), and *People v. Adler,* 50 N.Y.2d 730, 431 N.Y.S.2d 412, 409 N.E.2d 888, *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473. Those cases involve almost identical circumstances and it is true that in each of those cases the respective Court's analysis and reading of *Walter, supra,* would support the position of the United States in this case. The problem

with that argument is that the Court of Appeals for the Eighth Circuit, at footnote 4, also was faced with this exact argument and expressly refused to accept it. The Court said:

> The Court in *Barry* attempts to distinguish *Walter* on the grounds that the films were protected by the First Amendment and that the chemical test was not as significant an investigation as the viewing of a film. *Id.*, 673 F.2d at 920. We disagree with this analysis. *Walter* rested on the Fourth Amendment, not the First Amendment. The invasion of privacy and collection of inculpatory evidence involved in testing unidentified substances is parallel to the investigation and intrusion involved in screening a film. In *Adler*, the New York Court of Appeals dismissed the chemical analysis on the grounds that the content of the substance was already evident and the substance was legally in the possession of the police. This reasoning allows a finding of probable cause to eliminate the warrant requirement of the Fourth Amendment contrary to established principles of Fourth Amendment jurisprudence.

Thus, any fair reading of *Jacobsen, supra,* makes it clear that it is exactly on point. In this case, Lt. Townsend, having rightfully come into possession of a white powdery substance which he believed to be either cocaine, methamphetamine or barbiturates, was required, under the ruling of *Walter* and *Jacobsen*, to first obtain a warrant before performing any analysis on the substance to confirm his suspicion. There is no other way to read either of these decisions, and both of them are clearly binding on this Court. Thus, this Court has no alternative but to suppress the evidence obtained as a result of the unauthorized analysis performed by Lt. Townsend.

However, such a finding does not answer the question of whether all evidence obtained during the investigation should be suppressed. The defendant argues that it should and that, in effect, he should go free because of this mistake made by a law enforcement agent. The argument made by him is that all other evidence obtained at the time was "fruit of the poisonous tree" and must also be suppressed. This argument is not without merit.

In the Haes case, *supra,* the court, after finding that the Denver search was illegal because the officer had not obtained a warrant before viewing the film, also suppressed the evidence obtained in the Des Moines search, even though made pursuant to a warrant, because the information gained in the illegal Denver search made it possible to obtain the warrant for the Des Moines search.

The Court has no difficulty finding, from the facts summarized above and from the evidence at the hearing, that the only actions taken by law enforcement agents in this case which must be considered by the applicable law to be "wrong" is the field test performed by Lt. Townsend to determine if the white powdery substance was in fact a controlled substance. However, it is equally clear that the cocaine bags seized at the time of the arrest, and the testing of the residue, led to the issuance of the search warrant used in the search of the mobile home.

The affidavit for search warrant, executed by Lt. Townsend and FBI Agent Knox, which resulted in the issuance of the search warrant provided, *inter alia:*

> On September 21, 1983, Byrdell Clark, proprietor of Clark's 71 Storage located in Bella Vista, Arkansas, entered upon a storage locker he had rented to an individual that used the name of David Cooper. Mr. Clark found 39 bags of a white powdery substance. On September 25, 1983, Mr. Clark informed the Benton County Sheriff's Office of his discovery where upon law enforcement officers responded to investigate. On September 25, 1983, law enforcement officers tested the residue of the white powdery sutstance [sic] to see if the substance was in fact a possible controlled substance. Two (2) tests were performed on the residue by Lt. Don Townsend, Benton

County Sheriff's Office, and Capt. Phil Sciumbato of the Bella Vista Sheriff's Police, by the use of Valtox Kit which did result in a positive reading of the residue as being, in fact, cociane [sic]. Lt. Townsend has performed many tests in his law enforcement experience which later led to the conviction of those individuals dealing with controlled substance such as cocaine.

In *Jacobsen, supra,* the Court of Appeals for the Eighth Circuit stated at p. 300:

The fruits of this illegal search should have been suppressed. The finding of cocaine in a package being sent to the Jacobsens' home was the core of the affidavit which justified the issuance of the warrant to search the Jacobsens' home. The only other allegation contained in the affidavit is that Bradley Jacobsen is "mentioned in at least two investigative files for cocaine distribution." Without the statement that a test indicated the presence of cocaine in the powder, the affidavit does not provide probable cause to believe the Jacobsens possessed cocaine in their home. The search produced traces of cocaine, drug paraphernalia, and remnants of burned tape which matched that used to wrap the package. This evidence was improperly admitted. On this basis, we reverse the defendants' convictions on the drug related counts.

■ In this case, the finding of cocaine in the storage locker was the core of the affidavit justifying the issuance of the warrant to search Church's trailer. Without the statement about the finding of the plastic bags and powder and that a test indicated the presence of cocaine in the powder, the affidavit does not provide probable cause to believe defendant possessed cocaine (or other drugs) in his home.

Under the doctrine of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), *Haes* and *Jacobsen,* this Court has no choice but to suppress the evidence obtained in the search of the mobile home.

While the Court recognizes that the suppression of the cocaine bags and results of the tests performed on the residue and of the evidence obtained in the search of the mobile home may leave insufficient evidence to try Church, the Court is, nevertheless, left with the question of whether other evidence seized at the time of the arrest must be suppressed. Specifically, authorities seized certain evidence from a search of Church and his motor vehicle at the time of his arrest.

■ The law has long been that an arrest without a warrant may be made if the arresting officer has reasonable grounds to believe that a crime has been committed. *Wong Sun v. United States, supra; Pritchard v. Downie,* 326 F.2d 323 (8th Cir.1964). "Probable cause" for an arrest means more than a mere suspicion and exists where facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been or is being committed. The information upon which such belief is based need not be tantamount to that quantum of proof which would sustain a conviction of guilt. *Clay v. United States,* 394 F.2d 281 (8th Cir.1968), *cert. denied,* 393 U.S. 926, 89 S.Ct. 260, 21 L.Ed.2d 262.

■ The Court finds that at the time Townsend arrested Church, he had reasonable cause to do so even without the knowledge obtained by him in the field test. The Court also finds that if the field test had not been performed, Church would have, nevertheless, been arrested, and that there would have been probable cause to do so.

■ It is clearly the law that a reasonable search incident to a lawful arrest may be made without first obtaining a warrant. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Thus, all evidence obtained during the search of Church at the time of his lawful arrest, including the address book which, according to law enforcement agents, contained the names and addresses of persons known to them to be directly engaged in drug

trafficking, will not be suppressed and may be used at any trial of Church in this case.

That brings the Court to the evidence obtained in the search of Church's motor vehicle at the time of his arrest. The evidence is uncontroverted, because Church chose not to take the stand at the hearing, that when he arrived at the unit, he was asked if he was David Cooper and if he rented the unit in question, to both of which he replied affirmatively. He was then given a partial Miranda warning because the officer did not have his "card" with him. He was then asked if he would permit the officers to search his pickup. He replied that they could and that they would find nothing. Whereupon, the pickup was searched and, among other things, a bill from a well driller was obtained which ultimately resulted in the officers locating the mobile home in which he resided. Church had refused to give the officers the place of his residence. Thus, the search of the motor vehicle resulted only after Church knowingly consented to the search without a warrant, and the evidence obtained in that search also will not be suppressed.

In summary, the Court finds the field test resulted in an unlawful search and that the cocaine, and the bags which contained it, may not be used at trial. The Court further finds that the arrest of Church and the search of his automobile was lawful and that the evidence obtained as a result of the search of Church's person or his automobile may be used at trial. Finally, the Court finds the search of Church's mobile home was the fruit of an unlawful search and that the evidence discovered in that search may not be used at the trial of this case.

An order will be entered contemporaneously with the entry of this memorandum opinion to accomplish the above.